# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 12, 2025

Lyle W. Cayce
Clerk

————————

No. 24-30244

————————

B. B., *by and through her mother*, P.B.; D. D., *by and through his mother*, P.D.; E. E., *by and through his mother*, P.E.; G. G., *by and through her mother*, P.G.,

*Plaintiffs—Appellees*,

*versus*

Michael Harrington, *in his official capacity as the Secretary of the Louisiana Department of Health*; Louisiana Department of Health,

*Defendants—Appellants*.

———————————————————————

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:19-CV-770

———————————————————————

Before Ho, Engelhardt, and Douglas, *Circuit Judges*.

Per Curiam:*

Medicaid-eligible children in Louisiana claim the State isn't providing statutorily required mental health services. The district court certified a class that includes children who require "intensive behavioral services." But the

---

* This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

definition of those services is too vague to support an ascertainable class. So we vacate and remand for the district court to narrow its definition.

## I.

The district court initially certified the class to include children who had been recommended intensive care coordination, crisis services, and intensive behavioral services. But this court subsequently vacated that certification for lack of specificity in these terms. *See A.A. ex rel. P.A. v. Phillips*, 2023 WL 334010, at *3 (5th Cir. Jan. 20, 2023).

Following that initial remand, parties have stipulated to definitions of intensive care coordination and crisis services, so intensive behavioral services is the only category left in dispute.

Again certifying the class, the district court set out two steps for defining intensive behavioral services. First, such services must consist of "therapeutic interventions delivered to children and families in their homes and other community settings to improve youth and family functioning and prevent out-of-home placement in inpatient or psychiatric residential treatment facility settings." Second, intensive behavioral services must also involve one of ten specified components or interventions.

Defendants now appeal that class certification.

## II.

"It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970). And "the touchstone of ascertainability is whether the class is 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'" *Brecher v. Republic of Argentina*, 806 F.3d

22, 24 (2nd Cir. 2015) (quoting 7A Wright & Miller, Federal Practice and Procedure § 1760 (3rd ed. 1998)).

We conclude that the definition of intensive behavioral services set forth by the district court on remand is still too "amorphous or imprecise" to permit a class action. *John v. Nat'l Sec. Fire and Cas. Co.*, 501 F.3d 443, 445 n.3 (5th Cir. 2007) (cleaned up).

Start with the first prong of the proposed definition. A countless number of medical treatments are delivered to avoid "placement in inpatient . . . settings." And there is no clear line between what supports "youth and family function" and what does not.

As for the second prong, four of the ten specified interventions present similar line-drawing challenges—namely, "[i]mprovement of self-management of symptoms"; "[s]upport of the development, maintenance, and use of social networks, including the use of natural and community resources"; "[s]upport to address behaviors that interfere with a child's or youth's success in achieving educational and vocational objectives in school"; and "[i]mplementation of risk reduction and crisis prevention strategies."

We leave it in the capable hands of the district court to determine more precise and administrable criteria for class membership. Because Defendants' other claims depend on the definition of the class and subsequent proceedings, we do not address them now. *See Phillips*, 2023 WL 334010, at *3.

* * *

We vacate and remand to the district court for further proceedings.

No. 24-30244

DANA M. DOUGLAS, *Circuit Judge*, dissenting:

This is an undeniably difficult case, as evidenced by the now back-to-back decisions of our court vacating and remanding on the issue of class ascertainability. Although the majority opinion holds that the district court again got it wrong, I respectfully disagree and therefore dissent.

## I

### A

The Medicaid Act establishes a jointly financed "cooperative federal-state program through which the federal government provides financial aid to states that furnish medical assistance to eligible low-income individuals." *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 585 (5th Cir. 2004). States may choose whether to participate in Medicaid, but if they do, they "must comply with certain requirements imposed by the Act and regulations of the Secretary of Health and Human Resources." *Id.* at 586. Among those requirements, a participating state must ensure access to early and periodic screening, diagnostic, and treatment services ("EPSDT") for individuals under the age of twenty-one. 42 U.S.C. § 1396d(a)(4)(B). The EPSDT benefit "is designed to assure that children receive early detection and care, so that health problems are averted or diagnosed and treated as early as possible." Ctrs. for Medicare & Medicaid Servs., *EPSDT — A Guide for States*, 1 (2014), https://www.medicaid.gov/medicaid/benefits/downloads/epsdt-coverage-guide.pdf. In essence, EPSDT requires states to offer "the right care to the right child at the right time in the right setting." *Id.*

### B

Plaintiffs are minor children in Louisiana who are Medicaid recipients with diagnosed mental illnesses and conditions. They sued the Louisiana Department of Health (the "Department" or "LDH") on behalf of

4

themselves and a putative class of similarly situated Medicaid-eligible children. Plaintiffs allege that LDH has consistently failed to provide a statewide mental health system of intensive home- and community-based services ("IHCBS") necessary to treat their conditions, as required by Medicaid's EPSDT mandate.[1] Instead, the Department allegedly has implemented a fragmented and uncoordinated system with gaps in service coverage, availability, and accessibility; a lack of coordination between and among behavioral health providers and child-serving systems; and minimal medication management with infrequent counseling. Medicaid-eligible children requiring intensive mental health care are therefore often left untreated and, when they inevitably experience mental health crises, forced to seek emergency care or institutionalization in psychiatric facilities away from their families.

The district court initially certified the class to include all Medicaid-eligible youth under the age of twenty-one in Louisiana who have been diagnosed with a mental health or behavioral disorder and had been recommended IHCBS, which the court defined as "intensive care coordination, crisis services, and intensive behavioral services and supports that are necessary to correct or ameliorate Plaintiffs' mental illnesses or conditions." *A.A. ex rel. P.A. v. Phillips*, 339 F.R.D. 232, 236, 249 (M.D. La. 2021) (citation modified). We subsequently vacated that certification for lack of ascertainability and remanded with instructions for the district court "to clarify which services are included in the term IHCBS." *See A.A. ex rel. P.A.*

---

[1] Plaintiffs also brought claims for violations of the Americans with Disabilities Act of 1990, the Rehabilitation Act of 1973, and the reasonable promptness provisions of the Medicaid Act, but the district court dismissed those claims during the pendency of this appeal.

No. 24-30244

*v. Phillips*, No. 21-30580, 2023 WL 334010, at *3 (5th Cir. Jan. 20, 2023) (per curiam) (unpublished).

On remand, the parties agreed upon definitions for the "intensive care coordination" and "crisis services" components of IHCBS. The parties' sole disagreement thus centered on the meaning of "intensive behavioral services." Ultimately, in its amended class certification order, the district court adopted a definition proposed by Plaintiffs:

> Intensive Behavioral Services ... mean[s] "therapeutic interventions delivered to children and families in their homes and other community settings to improve youth and family functioning and prevent out-of-home placement in inpatient or psychiatric residential treatment facility settings," specifically consisting of [ten] discrete "components" (interventions):
>
> 1) "Medically necessary individual and family behavioral health counseling and therapy in the home;
>
> 2) Skill-based interventions for the remediation of behaviors or improvement of symptoms, including, but not limited to, the implementation of a care plan and/or modeling interventions for the child's/youth's family and/or significant others, to assist them in implementing the strategies;
>
> 3) Interventions that facilitate the development of adaptive skills to improve self-care, self-regulation and to ameliorate other functional impairments by intervening to decrease or replace non-functional behavior that interferes with daily living tasks or to avoid exploitation by others;
>
> 4) Development of skills or replacement behaviors that allow the child or youth to fully participate in the Child and Family Team (a team composed of the youth, family members, natural supports, and the behavioral health and other professionals caring for the youth) and service plans;

5) Improvement of self-management of symptoms;

6) Education of the child/youth and/or their family or caregiver(s) about, and how to manage the child's/youth's mental health disorder or symptoms;

7) Support of the development, maintenance, and use of social networks, including the use of natural and community resources;

8) Support to address behaviors that interfere with a child's or youth's success in achieving educational and vocational objectives in school;

9) Intensive therapeutic de-escalation interventions that restore personal and situational safety; and,

10) Implementation of risk reduction and crisis prevention strategies."

Am. Class Certification Order at 14–15, *A.A. ex rel. P.A. v. Harrington*, No. 21-30580 (M.D. La. Nov. 30, 2023), ECF 187, 14–15.

## II

Our task today is to determine whether the class certified by the district court is "adequately defined and clearly ascertainable," which requires that it be neither "amorphous" nor "imprecise." *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 933 n.36 (5th Cir. 2023) (first quoting *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (per curiam); and then quoting *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 n.3 (5th Cir. 2007)). The majority opinion holds that the amended class remains incapable of precise definition, *ante* at 3, but its reasoning is flawed in several respects.

As an initial matter, the majority opinion dissects the district court's adopted definition of intensive behavioral services into a two-pronged test. *Ante* at 2–3. But nothing in the district court's decision suggests that its

definition imposes separate, disjunctive requirements. Rather, the district court set forth an overarching definition for intensive behavioral services— "therapeutic interventions delivered to children and families in their homes and other community settings to improve youth and family functioning and prevent out-of-home placement in inpatient or psychiatric residential treatment facility settings"—and then it limited its definition to the ten specifically delineated "therapeutic interventions" or "components." In other words, what the majority opinion deems as two separate "steps" for defining intensive behavioral services is for all intents and purposes simply one comprehensive step.

The shortcomings of the majority opinion's bifurcated interpretation become apparent in its own reasoning. In discussing "the first prong of the proposed definition," the majority opines that "a countless number of medical treatments" would fall under the definitional umbrella for intensive behavioral services. *Ante* at 3. That is true enough if the first portion of the district court's definition is read in isolation. But that was clearly not the intent of the district court, which, within the same sentence, expressly limited the number of qualifying "therapeutic interventions" to those ten enumerated components. We should not fault the district court for a lack of precision within the broader definition when that definition was always meant to be read "with reference to [the] set of [ten] discrete behavioral health interventions." Am. Class Certification Order, *supra*, at 15.

Moreover, the majority opinion takes issue with the ascertainability of four specific interventional components (*i.e.*, Numbers 5, 7, 8, and 10), but it does so without explanation or elaboration. In my view, it is not reasonable to expect the district court on remand to craft an ascertainably clear definition when our instructions themselves are unduly vague. While brevity

8

is a canon of good legal writing,[2] it should not cost us clarity in our edicts. We owe more forthright and useful guidance not only to the district court but also to the litigants. *Cf. Altria Grp., Inc. v. Good*, 555 U.S. 70, 98 (2008) (THOMAS, J., joined by SCALIA, C.J., and ALITO, J., dissenting) ("We owe far more to the lower courts, which depend on this Court's guidance, and to litigants, who must conform their actions to the Court's [holding]."); *United Bhd. of Carpenters & Joiners of Am. v. United States*, 330 U.S. 395, 413 (1947) (FRANKFURTER, J., dissenting, with VINSON, C.J., and BURTON, J., concurring in result) ("The lower courts must apply the law as laid down by this Court and we owe them clarity of pronouncement.").

This aside, I nevertheless disagree with the ultimate ascertainability determination reached by the majority opinion. All ten interventional components provide objective criteria upon which the court may readily identify class members. As the district court explained, it can mechanically determine whether a person qualifies as a member of the class by looking to that person's medical records to see if a healthcare provider has recommended an intervention that falls within one of those discrete components of intensive behavioral services. For instance, the district court can ascertain whether a provider's recommendation for a particular intervention qualifies as a recommendation for "individual and family behavioral health counseling and therapy in the home" or for "[s]upport to address behaviors that interfere with a child's or youth's success in achieving educational and vocational objectives in school." The district court, in its discretion, determined that it could conduct this inquiry without speculation or subjectivity.

------

[2] *See* John Minor Wisdom, *Wisdom's Idiosyncrasies*, 109 YALE L.J. 1273, 1278 (2000).

No. 24-30244

Additionally, the district court derived the ten specific components from a declaration submitted by Plaintiffs from Dr. Richard N. Shepler—a clinical psychologist with more than forty years of practical and supervisory experience providing and implementing statewide intensive mental health interventions to Ohio youth. The Department's own expert, Dr. Roxanne Kennedy, agreed with the description of the substance of intensive behavioral services set forth in Dr. Shepler's declaration, including the ten interventional components.[3] Thus, because "[t]he actual practitioners (and experts) plainly understand what is meant by the term Intensive Behavioral Services," the district court determined that "it is feasible . . . to objectively sift through who is a class member and who is not." Am. Class Certification Order, *supra*, at 15.

Because the district court's conclusion was not based on an erroneous view of the law or a clearly erroneous assessment of the evidence, nor would all reasonable persons reject the district court's view, I would hold that it did not abuse its discretion in adopting this definition of intensive behavioral services. *See Yates v. Collier*, 868 F.3d 354, 359 (5th Cir. 2017); *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 638 (5th Cir. 2012). Accordingly, I respectfully dissent.

---

[3] *Compare* Ex. A: Decl. of Richard N. Shepler at 9–11, *A.A. ex rel. P.A. v. Harrington*, No. 21-30580 (M.D. La. Aug. 31, 2023), ECF 181-1, 10–12 (Dr. Shepler listing the interventional components within a section entitled "THE SUBSTANCE OF 'INTERVENTIONAL BEHAVIORAL SERVICES'"), *with* Ex. B: Decl. of Roxanne Kennedy at 7, *A.A. ex rel. P.A. v. Harrington*, No. 21-30580 (M.D. La. Aug. 31, 2023), ECF 181-2, 8 (Dr. Kennedy expressing "agree[ment] with certain aspects of Dr. Richard Shepler's expert declaration," including "the description of the substance of 'intensive behavioral services'").